J-S24035-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.L.A.-A., J.J.S., A.J.A., X.A.A., Minors, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.A., Mother, | : | |
| | : | |
| Appellant | : | No. 3034 EDA 2014 |

Appeal from the Orders entered on September 19, 2014
in the Court of Common Pleas of Philadelphia County,
Family Court Division, No(s): CP-51-AP-0000730-2013,
CP-51-AP-0000731-2013, CP-51-AP-0000732-2013;
CP-51-AP-0000733-2013; CP-51-DP-0000605-2012;
CP-51-DP-0000606-2012; CP-51-DP-0000607-2012;
CP-51-DP-0000608-2012

BEFORE: GANTMAN, P.J., ALLEN and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.: **FILED MAY 22, 2015**

J.A. ("Mother") appeals from the Orders granting the Petitions filed by the Department of Human Services of Philadelphia County ("DHS") to involuntarily terminate her parental rights to her four minor children (collectively "Children"), A.L.A.-A. (born 4/29/02), A.J.A. (born 9/27/03), X.A.A. (born 1/5/08) and J.J.S. (born 1/27/09), pursuant to section 2511(a) and (b) of the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b). We affirm.

The trial court set forth the relevant factual and procedural history in its Opinion, which we adopt for purposes of this appeal. *See* Trial Court Opinion, 1/5/15, at 1-3.

On appeal, Mother raises the following issue for our review: "Whether the [trial] court erred in terminating Mother's parental rights and changing the [Family Service Plan ("FSP")] goal to adoption where the evidence was not clear and convincing to terminate Mother's parental rights where DHS failed to refer Mother for services necessary for Mother to complete her FSP objectives?" Brief for Mother at 4 (capitalization omitted).

Our standard of review is as follows:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> … [U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826–27 (Pa. 2012) (citations omitted).

Termination of parental rights is controlled by section 2511 of the Adoption Act. *See* 23 Pa.C.S.A. § 2511. The burden is on the petitioner to prove, by clear and convincing evidence, that the asserted grounds for seeking the termination of parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009). "[C]lear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Id***. (citation and quotation marks omitted).

Satisfaction of any one subsection of Section 2511(a), along with consideration of Section 2511(b), is sufficient for the involuntary termination of parental rights. ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In this case, we will review the trial court's decision to terminate Mother's parental rights based upon section 2511(a)(1) and (b), which state the following:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> * * *
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on

- 3 -

the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

We have explained this Court's review of a challenge to the sufficiency of the evidence supporting the involuntary termination of a parent's rights, pursuant to section 2511(a)(1), as follows:

To satisfy the requirements of section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties.

\* \* \*

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citations omitted).

[T]o be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

- 4 -

J-S24035-15

*In re Z.P.*, 994 A.2d 1108, 1119 (Pa. Super. 2010) (citation omitted); *see also In re Adoption of C.L.G.*, 956 A.2d 999, 1006 (Pa. Super 2008) (*en banc*).

Further, regarding the definition of "parental duties," this Court has stated as follows:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . [his] physical and emotional needs.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted).

With respect to the "needs and welfare" analysis pertinent to section 2511(b), we have observed the following:

- 5 -

> [I]nitially, the focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child. However, Section 2511(a)(8) explicitly requires an evaluation of the "needs and welfare of the child" prior to proceeding to Section 2511(b), which focuses on the "developmental, physical and emotional needs and welfare of the child." Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent. Moreover, only if a court determines that the parent's conduct warrants termination of his or her parental rights, pursuant to Section 2511(a), does a court "engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." Accordingly, while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d at 1009 (citations omitted).

Regarding section 2511(b), the trial court inquires whether the termination of Mother's parental rights would best serve the developmental, physical and emotional needs and welfare of the Children. *See In re C.M.S.*, 884 A.2d 1284, 1286-87 (Pa. Super. 2005). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *Id*. at 1287 (citation omitted). The trial court must also discern the nature and status of the parent-child bonds, with utmost attention to the effect on the Children of permanently severing that bond. *Id*.; *see also In re Z.P.*, 994 A.2d at 1121 (stating that "the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial

relationship."); *In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008) (explaining that, in cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists). Additionally, "the strength of emotional bond between a child and a potential adoptive parent is an important consideration in a 'best interests' analysis." *In re I.J.*, 972 A.2d 5, 13 (Pa. Super. 2009); *see also In re T.S.M.*, 71 A.3d 251, 268 (Pa. 2013) (stating that "courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents."). Moreover, courts are not required to use expert testimony when conducting a bonding analysis and may utilize evaluations by social workers and caseworkers to show the bond between parents and their children. *In re Z.P.*, 994 A.2d at 1121. Finally, the focus in terminating parental rights under section 2511(a) is on Mother, but it is on the Children under section 2511(b). *In re Adoption of C.L.G.*, 956 A.2d at 1008.

On appeal, Mother contends that DHS referred her to Achieving Reunification Center ("ARC") for services to meet her FSP for reunification, and that she was supposed to receive through ARC the following services: anger management, domestic violence counseling, drug and alcohol counseling, individual counseling and job training. Brief for Mother at 8. Mother claims that, after she and J.S. ("Father") were dismissed from the

ARC program,[1] DHS failed to refer her to another agency for these services so that she could meet her FSP objectives. *Id*. at 9. Although Mother acknowledges that the trial court had entered an Order requiring her to go to the Clinical Evaluation Unit ("CEU") at the conclusion of every review hearing for the purpose of drug screening and for drug treatment monitoring, Mother claims that DHS never referred her to CEU for the services that were to have been provided by ARC, and the trial court never ordered her to receive such services from CEU. *Id*. Mother contends that "CEU needs a referral from DHS and/or from the [trial] court through a court order to provide referrals for such services." *Id*.

The trial court thoroughly addressed Mother's claim and concluded that it lacks merit. *See* Trial Court Opinion, 1/5/15, at 4-5, 8-10. We agree with the sound reasoning of the trial court and affirm on this basis. *See id*.[2]

Orders affirmed.

---

[1] Mother was discharged from the ARC program because she was living with Father, despite the fact that she and Father had restraining orders against each other. N.T., 9/19/14, at 21.

[2] We further observe that, following Mother's discharge from ARC, CEU scheduled an intake evaluation for Mother, which would have resulted in the provision of services for domestic violence, anger management, individual therapy and drug and alcohol abuse to Mother by CEU. *See* N.T., 9/19/14, at 21-23. However, Mother repeatedly refused to attend the intake evaluation. *Id*.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/22/2015




IN THE COURT OF COMMON PLEAS
FOR THE COUNTY OF PHILADELPHIA
FAMILY COURT DIVISION

In re: In the Interest of A.L.A., J.J.S., A.J.A., X.A.A.

APPEAL OF: J.A., Mother

: CP-DP-0000608-2012
: CP-DP-0000605-2012
: CP-DP-0000607-2012
: CP-DP-0000606-2012
: CP-51-AP-0000730-2013
: CP-51-AP-0000731-2013
: CP-51-AP-0000732-2013
: CP-51-AP-0000733-2013
: 3034 EDA 2014

## OPINION

**Fernandes, J.:**

Appellant, J.A. ("Mother"), appeals from the orders entered on September 19, 2014, granting the petitions filed by the Department of Human Services of Philadelphia County ("DHS") to involuntarily terminate her parental rights to A.L.A. ("Child #1"), J.J.S. ("Child #2), A.J.A. ("Child #3"), and X.A.A. ("Child #4") pursuant to the Adoption Act, 23 Pa.C.S.A. §2511 (a)(1), (2), (5), (8), and (b). Michael P. Marryshow, Esquire, counsel for Mother, filed a timely Notice of Appeal with a Statement of Errors Complained Of pursuant to Rule 1925(b).

## Factual and Procedural Background

On April 10, 2012, DHS received a General Protective Services ("GPS") report alleging that on April 6, 2012, J.S. ("Father") evicted Child #1, Child #2, Child #3, and Child #4 (collectively referred to as "children") from his home (DHS Exhibit A). The GPS report also alleged that Mother failed to retrieve Child #1 and Child #3 from school at the end of the day on April 10, 2012, because she had been detained by police regarding an altercation between Mother and Father which resulted in Mother cutting Father with a knife and Mother throwing a brick through Father's car window (DHS Exhibit A). Child #1 witnessed this altercation. The GPS report also alleged that the children were in a deplorable living situation, exposed to extensive domestic violence, were not properly being cared for, and both parents were using drugs (DHS Exhibit A), (N.T. 9/19/14, pg. 5). The GPS report was substantiated (N.T. 9/19/14, pg. 5). DHS obtained an Order of Protective Custody ("OPC") and placed the children in foster care and on April 12, 2012, a shelter care hearing was held and the OPC was lifted and the temporary commitment to DHS was ordered to stand.

On May 14, 2012, an initial Family Service Plan ("FSP") was developed for Mother (DHS Exhibit A). The goal for the children was to "Return to Parent, Guardian, Custodian" while Mother's FSP objectives were: successfully complete substance abuse counseling, locate and maintain employment, including opening a checking and savings account for at least six months, attend and complete domestic violence and anger management counseling, attend routine dental and medical appointments for children, attend and complete Family School, attend and complete asthma training for Child #2 and Child #3, maintain appropriate interactions during visits with children, locate and maintain stable housing, comply with any probation recommendations, begin family therapy at the Children's Crisis Treatment Center ("CCTC"), and complete a Parenting Capacity Evaluation (N.T. 9/19/14, pg. 6), (DHS Exhibit A). Throughout the life of this case Mother was aware of her FSP objectives because she attended several FSP meetings and Mother attended intake appointments for Child #1 and Child #3 where Mother's FSP objectives were discussed (N.T. 9/19/14, pg. 6).

On April 20, 2012, an adjudicatory hearing was held for the children and temporary commitment was discharged and the children were committed to DHS based on present inability of parents. The trial court ordered Mother to be referred to the Achieving Reunification Center ("ARC") for services, the Clinical Evaluation Unit ("CEU") for a full drug and alcohol screen, a dual diagnosis assessment and for domestic violence counseling (DHS Exhibit A). The trial court further ordered that Mother was to comply with all her FSP objectives, services and recommendations, and Mother was to have weekly supervised visitation (DHS Exhibit A). On July 20, 2012, a permanency review hearing was held and the court found that Mother was minimally compliant with her permanency plan and reasonable efforts were made by DHS. At this permanency hearing, the court ordered for Mother to schedule an appointment with CCTC and to have two hour weekly supervised visitation with children. On October 18, 2012, a permanency review hearing was held and Mother was again found to be minimally compliant with her permanency plan and the court found reasonable efforts made by DHS. The court ordered that Mother to be referred to the CEU for a drug screen and assessment, follow up with CCTC, and to continue her weekly supervised visitation with children. The Urine Drug Testing Report for Mother completed on October 18, 2012, noted that Mother tested positive for opiates and phencyclidine ("PCP") (N.T. 9/17/14, pgs. 7-8).

On November 7, 2012, Mother's FSP was again revised. The goal for children remained "Return to Parent, Guardian, Custodian" and Mother's FSP objectives remained the same with some additional

objectives added: understand, learn and use at least two non-physical discipline methods, sign all needed authorization forms to allow DHS to receive all copies of evaluations and reports, achieve and maintain sobriety, participate in an evaluation for drug and alcohol abuse and comply with all treatment recommendations, verifiable by six successful drug screens, and enroll and regularly attend a GED or training program (DHS Exhibit A). Mother attended the FSP meeting and signed the FSP (DHS Exhibit A). On November 14, 2012, Mother tested positive for opiates and PCP (N.T. 9/17/14, pg. 8). On January 11, 2013, CEU completed a report of non-compliance regarding Mother. On January 15, 2013, a permanency review hearing was held where Mother was found to be minimally compliant with her permanency plan. The court noted that Mother was not attending ARC and had not participated in any of her children's therapy at CCTC. The court ordered for Mother to be re-referred for a drug screen and assessment at the CEU, including three random drug screens prior to the next court date. On March 19, 2013, Mother's FSP was revised. The goal for children changed to "Adoption" and the parental objectives for Mother remained the same as the previous FSP. Mother did not attend or participate in the FSP meeting. On April 2, 2013, a permanency review hearing was held where Mother was found to be minimally compliant with her permanency plan. Mother had missed her last three visits with children. The court ordered for Mother to be re-referred to the CEU for a drug screen and dual diagnosis assessment, including three random drug screens prior to the next court hearing. On May 7, 2013, a permanency review hearing was held. Mother was found to be minimally compliant and again ordered to the CEU for a drug screen and assessment. Mother was referred to the CEU at every court date and the DHS social worker testified that Mother was not compliant in reporting to the CEU (N.T. 9/19/14, pg. 7). On October 1, 2013, a permanency review hearing was held where the court ordered Mother's visitation to be suspended because of the amount of visits she had missed with her children (N.T. 9/19/14, pgs. 14-15). On December 30, 2013, a Petition for Involuntary Termination of Parental Rights was filed by DHS.

**Discussion:**

On appeal, Mother raised the following issues:

1. Did the trial court commit an error of law and abuse of discretion by involuntarily terminating Mother's parental rights under 21 Pa.C.S.A. §2511(a), where the evidence presented at trial was not clear and convincing to terminate Mother's parental rights due to Mother's inability to visit children because her visitation was suspended and DHS's' failure

to refer Mother to programs or institutions where she could get services to meet her FSP objectives?

2. Did the trial court commit an error of law and abuse of discretion by involuntarily terminating Mother's parental rights under 23 Pa.C.S.A. §2511(b), where DHS failed to prove by clear and convincing evidence that involuntary terminating Mother's parental rights would best serve emotional needs and welfare of Children?

As to the first issue on appeal, the grounds for involuntary termination of parental rights are enumerated in the Adoption Act at 23 Pa.C.S.A. §2511(a). The Adoption Act provides the following grounds for involuntary termination:

**(a) General Rule** – The rights of a parent, in regards to a child, may be terminated after a petition is filed on any of the following grounds:

(1) The parent, by conduct continuing for a period of at least six months immediately preceding the filing of the petition, has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

In proceedings to involuntary terminate parental rights; the burden of proof is on the party seeking termination to establish by clear and convincing evidence of the existence of grounds for termination. *In re Adoption of Atencio*, 539 Pa. 161, 650 A.2d 1064 (1994). To satisfy section (a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. The standard of clear and convincing evidence is defined as testimony that is so clear, directly weighty and convincing as to enable the trier of fact to come to a clear conviction without hesitance of the truth of precise facts in issue. *In re D.J.S.*, 1999 Pa. Super. 214 (1999).

Mother did not achieve any of her FSP objectives throughout the life of this case, even though Mother was aware of her FSP objectives (N.T. 9/19/14, pg. 6). At every permanency review hearing, Mother was found to be minimally compliant or non-compliant with her FSP objectives. Mother never enrolled in a drug and alcohol program, Mother was non-compliant with the CEU, Mother was not compliant with her mental health objective and Mother did not complete ARC (N.T. 9/19/14, pgs. 9-11). Since the shelter care hearing on April 12, 2012, Mother was offered weekly supervised visitation. Mother's visits were never changed from supervised to unsupervised. In fact, Mother's visitation was suspended due to the numerous amounts of visits she missed (N.T.

9/19/14, pgs. 14-15). Mother's inconsistency with visiting caused Child #1 to decline in her mental health treatment and Child #1's therapist testified that because of the affect the missed visits had on Child #1, it would be beneficial to Child #1 if Mother's visits were suspended (N.T. 9/19/14, pgs. 14-15, 49). The court ordered that Mother had to maintain three consecutive visits and if she did not and was unable to provide an explanation for the missed visits, Mother's visits would be suspended (N.T. 9/19/14, pgs. 14-15). Mother was unable to maintain three consecutive visits and she was unable to provide an excuse for missed visits pursuant to the court order dated October 1, 2013, and thus, Mother's visits with children were suspended (N.T. 9/19/14, pgs. 14-15, 49). At every hearing, Mother was directed to go to the CEU for drug and alcohol testing and monitoring. Only one time did Mother comply with the court order. Mother has a history of drug use and tested positive for opiates and PCP on October 18, 2012, and on November 14, 2012 (N.T. 9/19/14, pgs. 7-8). One of Mother's FSP objectives was to enroll in a drug and alcohol program, which Mother never complied with (N.T. 9/19/14, pg. 8). Mother is unemployed and was referred to ARC for job training, which Mother never completed (N.T. 9/19/14, pg. 11). Although Mother was discharged from ARC because Mother and Father were not allowed to attend services together, DHS referred Mother to the CEU where Mother could have completed the services and treatment she was completing at ARC (N.T. 9/19/14, pgs. 21-22). All the services were offered to help Mother reunify with her children. The record establishes that DHS provided and offered reasonable and adequate services to remedy the conditions that brought the children into care.

On December 30, 2013, DHS filed the petition for termination. Since 2012, Mother continuously fails to perform her parental duties toward the children. Mother's pattern of non-compliance continued for at least six months prior to the filing of the termination petition, as established by every permanency review order since July 20, 2012. As a result, all the elements of the Adoption Act, 23 Pa.C.S.A. §2511(a)(1) have been fully satisfied.

The Adoption Act at 23 Pa.C.S.A. §2511(a)(2) also includes, as grounds for involuntary termination of parental rights, the repeated and continued incapacity, abuse, neglect or refusal of the parent that causes the children to be without essential parental care, control, or subsistence necessary for their physical or mental well-being, and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. This ground is not limited to affirmative misconduct. It may include acts of refusal to perform parental duties but more specifically on the needs of the children. *Adoption of C.A.W.*, 683 A.2d 91, 914 (Pa. Super. 1996). Courts have further

held that the implications of the parent's limited success with services geared to remedy the barriers to effective parenting can also satisfy the requirements of §2511(a)(2). *In the matter of B.L.W.*, 843 A.2d 380 (Pa. Super. 2004), the court's grave concerns about the Father's ability to provide the level of protection, security and stability that his children needed was sufficient to warrant termination. Id. at 388.

Mother's lack of care and supervision of her children led to the children's dependency adjudication and to their placement in foster care on April 10, 2012. Mother has consistently failed and refused to remedy the causes that brought children into care. Mother is unable and unwilling to provide the level of protection, security and stability that the children need. Because of Mother's drug use, history of domestic violence, and unwillingness to comply with her treatment plan, Mother is unable to protect children and keep them safe (N.T. 9/19/14, pgs. 7-9, 11). One of the reasons children came into DHS supervision was due to their exposure to extensive domestic violence between Mother and Father (N.T. 9/19/14, pg. 11). Even after a domestic violence complaint and the dual restraining orders between Mother and Father, Mother continued to reside with Father, violating the restraining order (N.T. 9/19/14, pgs. 11-12). On several occasions, Mother was directed to go to drug and alcohol treatment but she refused to do so. Based on testimony on the record, the trial court had grave concerns about Mother's ability to provide the level of protection, security, and stability that the children need. Mother refuses to preform her parental duties. Mother was very inconsistent in visiting with children until the trial court suspended her visits due to the impact it was having in Child #1's mental health (N.T. 9/19/14, pgs. 14-15, 49). The children have been in placement for a period of twenty-nine months (N.T. 9/19/14, pg. 4). The children need permanency. Mother is unable to remediate the causes that brought children into care. DHS has met its burden under 23 Pa.C.S.A. §2511(a)(2).

DHS also requested termination of parental rights under 23 Pa.C.S.A. §2511(a)(5), whereby children may be removed by court or voluntary agreement and placed with an agency at least six months, conditions which led to the placement of the children continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services reasonably available to the parent are not likely to remedy the conditions leading to placement, and termination best serves the children's needs and welfare.

DHS, as a child and youth agency, cannot be required to extend services beyond the period of time deemed as reasonable by the legislature or be subjected to herculean efforts. A child's life cannot be put on hold in hope that the parent will summon the ability to handle the responsibilities of parenting. *In re J.T.*, 817 A.2d 509 (Pa. Super. 2001). As a consequence, Pennsylvania's Superior Court has recognized that the children's needs and welfare requires agencies to work toward termination of parental rights when a child has been placed in foster care beyond reasonable temporal limits and after reasonable efforts for reunification have been made by the agency, that have resulted unfruitful. This process should be completed within eighteen months. *In re N.W.*, 851A.2d 508 (Pa. Super. 2004).

The children have been in care for a period of twenty-nine months (N.T. 9/19/14, pg. 4). Mother continuously fails to perform her parental duties and cannot remedy the conditions that led to children's placement (N.T. 9/19/14, pgs. 7-9, 11-12, 14-15, 49). Hence, Mother's minimal compliance or non-compliance with her FSP objectives compel this court to conclude that children are no closer to be reunified with Mother. The children's life cannot be put on hold any longer in hope that Mother will remedy the conditions that led to placement within a reasonable amount of time. Mother was aware of her FSP objectives, but was unable to complete them within twenty-nine months. Through the life of this case Mother was never able to obtain unsupervised visitation and her visitation was so inconsistent and had such a negative effect on the children that a therapist testified that it was in the best interest of the children to suspend Mother's visits (N.T. 9/19/14, pgs. 14-15, 49). Mother was aware of the emotional toll that her missed visits caused the children. On October 1, 2013, at a court hearing with Mother present, Mother was told that she was being given one last chance and that if she continued to miss visits without an explanation, her visits would be suspended. As the record established, for the past twenty-nine months, Mother was unable to demonstrate that she had the capacity to parent. The needs and welfare of the children dictate that termination and adoption would best serve their permanency needs. DHS met its burden under the Adoption Act, 23 Pa.C.S.A. §2511(a)(5).

As to 23 Pa.C.S.A. §2511(a)(8), DHS met its burden by clear and convincing evidence that the children have been out of Mother's care for twelve months or more, and the conditions leading to the placement still exits, and termination would best serve the needs and welfare of the children. The children have been continuously under DHS' custody for a period of twenty-nine months (N.T. 9/19/14, pg. 4). The conditions that led to the children's placement still exist. Despite the good

faith efforts of DHS to make services available, it is in the best interest of the children to terminate Mother's parental rights (N.T. 9/19/14, pgs. 16, 45, 64-65, 74).

The trial court will now consider Mother's last issue on appeal, whether the termination of parental rights would best serve the emotional needs and welfare of the children under 23 Pa.C.S.A. §2511(b). The party seeking termination must prove by clear and convincing evidence that the termination is in the best interest of the child. The best interest of the child is determined after consideration of the needs and welfare of the child, such as love, comfort, security and stability. *In re Bowman*, 426 Pa. Super. 647, A.2d 217 (1994). See also *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2009). Pursuant to 23 Pa.C.S.A. §2511(b), the trial court must also consider what, if any bond exists between Mother and children. *In re Involuntary Termination of C.W.S.M. and K.A.L.M*, 839 A.2d 410, 415 (Pa. Super. 2003). The trial court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387 (Pa. Super. 2003). In assessing the parental bond, the trial court is permitted to rely upon the observations and evaluations of social workers. *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008). Under 23 Pa.C.S.A. §2511(b), the rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical, if found to be beyond the control of the parent.

The children will not suffer any irreparable harm by terminating Mother's parental rights (N.T. 9/19/14, pgs. 17, 46, 75). Foster parents and Child #2, Child #3, and Child #4 have a strong parent/child bond (N.T. 9/19/14, pgs. 43, 45, 64-65, 75-76). The DHS social worker testified that Child #2 is bonded with his foster mother and he calls her "mom" (N.T. 9/19/14, pgs. 74, 76). Child #2 had severe asthma problems when he moved into his foster home and it was his foster mother who oversaw his medical needs to ensure that he received the appropriate medical care and asthma medication that he needed (N.T. 9/19/14, pg. 76). The DHS social worker testified that Child #3 is doing really well in his pre-adoptive foster home and that he has bonded with his foster mother and he calls her "mom" (N.T. 9/19/14, pgs. 43, 45). Child #3 is in therapy due to his exposure to domestic violence and substance abuse (N.T. 9/19/14, pg. 50). Child #3's therapist testified that Child #3's foster mother has been involved in Child #3's mental health treatment since he started attending therapy sessions in 2012 (N.T. 9/19/14, pg. 51). The DHS social worker also testified that Child #4 is doing really well in his pre-adoptive foster home and is bonded with his foster mother and he calls her "mom" as well (N.T. 9/19/14, pg. 64). Child #4 is young and barely

knows Mother. Child #4 identifies with his foster mother and he considers his foster home to be his only home, he goes to his foster mother for affection and also when he is afraid (N.T. 9/19/14, pgs. 64, 75). Child #2 and Child #4 are in the same pre-adoptive foster homes (N.T. 9/19/14, pg. 55). Child #2, Child #3, and Child #4 continue to flourish in their foster homes and they have bonded with their foster family.

Although Child #1 is not in a pre-adoptive home, it is in her best interests for Mother's parental rights to be terminated (N.T. 9/19/14, pgs. 15-16, 45). Child #1 suffers from severe mental health issues and needs constant support (N.T. 9/19/14, pg. 13). Child #1 has been hospitalized on two occasions due to her mental health issues (N.T. 9/19/14, pg. 13). Child #1's mental health severely declines when Mother is sporadic with visits (N.T. 9/19/14, pgs. 13-15). Child #1's mental instability is a result of her exposure to extensive and chronic domestic violence between the Mother and Father, exposure to Mother's substance abuse and a possible exposure to a suicide attempt (N.T. 9/19/14, pgs. 29-30). Mother was given many opportunities to be involved in Child #1's treatment but did not avail herself (N.T. 9/19/14, pg. 30). The DHS social worker testified that Mother would not be able to meet Child #1's medical needs or emotional support that Child #1 requires to recover (N.T. 9/19/14, pg. 29). Child #1 needs permanency and stability so she can deal with her past trauma and move forward (N.T. 9/19/14, pg. 17). Child #1 will continue with treatment after Mother's parental rights are terminated (N.T. 9/19/14, pg. 31). Not visiting with Mother would bring emotional stability to Child #1's life. Child #1 was in a pre-adoptive home and that home still wants to be considered a resource for her (N.T. 9/19/14, pg. 16). Child #1 will not suffer irreparable harm by the termination of Mother's parental rights (N.T. 9/19/14, pg. 17).

Mother and children do not have a parent/child bond. Mother has not seen her children since the visits were suspended in late 2013 (N.T. 9/19/14, pg. 49). Terminating Mother's parental rights would not destroy an existing necessary relationship between Mother and children. Prior to visits being suspended, Mother missed many visits with her children and only attended one of the children's therapy session even though Mother was invited to attend every therapy session for all her children.

It is in the best interest of children to be adopted (N.T. 9/19/14, pgs. 16, 45, 64-65, 74). DHS has provided reasonable services to Mother. The trial court has found reasonable efforts at every permanency review hearing. The court determined that the testimonies of the DHS witnesses were

credible. Additionally, the record clearly establishes that Mother's parental rights are being terminated due to her lack of non-compliance with her FSP objectives, no parent/child bond, and no irreparable harm would occur by terminating Mother's parental rights. Terminating Mother's parental rights is not due to environmental factors. The children have been in placement for twenty-nine months and the children need permanency. Consequently, the trial court did not err in terminating Mother's parental rights and changing the goal to adoption, it would best serve the emotional needs and welfare of the children.

**Conclusion:**

For the aforementioned reasons, the court finds that DHS met its statutory burden by clear and convincing evidence regarding the termination of the parental rights pursuant to 23 Pa.C.S.A. §2511(a) and (b). The court also finds that it will not cause irreparable harm to the children to sever any bond, and it is in the best interest of the children since it would best serve the emotional needs and welfare of the children.

Accordingly, the orders entered on September 19, 2014, terminating the parental rights of Mother, J.A., should be affirmed.

By the court,

Joseph Fernandes, J.